## FILES, AUDITOR, v. FULLER.

1. STATUTES: *Repeal of: Effect on pending suits: Obligations of contracts: Attorney's fees.*
   The act of February 17, 1883, repealing the over-due tax acts of 1881, did not affect suits then pending under those acts, nor deprive attorneys of any rights to compensation for services in such pending suits.

2. ATTORNEY'S FEES: *Not apportionable.*
   An attorney's services can not be apportioned by time.

3. LEGISLATURE: *Power over courts and subsequent Legislatures.*
   No Legislature has power to prescribe to the courts rules for interpretation, or to fix for future Legislatures any limits of power as to the effects of their action.

ERROR to *Pulaski* Circuit Court.

Hon. F. T. VAUGHAN, Circuit Judge.

*C. B. Moore*, Attorney General, for plaintiff in error.

*R. T. Fuller* for defendants in error.

This petition was for mandamus to compel the Auditor to

issue certificates for attorney's fees in a suit brought under *sec. 1, Acts 1881, p. 64*, and it is submitted :

1.   All contracts, whoever the parties may be, are made with reference to existing laws, and all such laws become part of the contract. *18 Ark., 269; 21 Ib., 85; 40 Ark., 423; 1 Marr (Iowa), 204; 2 Chan. (Wis.), 182.*

2.   The law in force when the suit was brought, not when the fees were allowed, govern the rights of the parties. *6 La. Ann., 770; Gantt's Dig., sec. 5624.*

3.   The fees fixed by the Chancellor are not affected by subsequent legislation, because the Legislature could not divest vested rights. *5 Ark., 217.*

4.   The fees being fixed by the Chancellor, it was the plain ministerial duty of the Auditor to issue certificates of indebtedness under *section 2779 Gantt's Dig., 42 Ark., 233.*

EAKIN, J.   This writ of error brings up a peremptory mandamus of the Pulaski Circuit Court, commanding the Auditor to issue a certificate of indebtedness of the State.

The writ of mandamus was impetrated by certain counsel who had been employed and rendered services in procuring the condemnation of lands, under the over-due tax law, on the chancery side of the Dallas Circuit Court. Their petition shows that they commenced the suit for that purpose at the September term of the court in 1882 in the name of the State, on the relation of R. H. Deadman against certain lands, under the acts of March twelfth and twenty-second, 1881.   That they prosecuted the suit to final hearing and decree at the March term, 1883. That it was determined by the court the taxes on 795 tracts of land were over-due and unpaid, and they were condemned to be sold for their payment and for costs, including the fees of attorneys.   That, at the same term, the court allowed and fixed their fees at the rate of three

dollars and a half upon each tract. That the lands were sold by a commissioner on the twenty-eighth of March, 1883, and 679 of the tracts were struck off to the State, whereby petitioners claim they were entitled to receive from Files, as Auditor, a certificate of indebtedness for $2,376.50, the aggregate of fees allowed by the court. They admit they have received the sum of $443.29 out of the proceeds of the lands purchased by individuals, and which was paid over to them by a decree of the court, leaving still due the sum of $1,933.21, for which they are entitled to a warrant.

They then allege that on the twelfth of March, 1884, they presented to Files, as Auditor, a certified copy of the decree in said cause, and demanded a warrant or certificate for the last named sum, which he refused to issue, wherefore they pray for the writ, etc.

They exhibit the decrees of the Dallas court condemning the lands, ordering sales, confirming the report of the commissioner, fixing the amount of attorney's fees, and making disposition of the money in hands. A demurrer to this petition was overruled. The State rested, and the order for mandamus was made peremptory as prayed.

This case seems similar, in all material respects save one, to that of *Files, Auditor, v. Gatewood, 42 Ark., 233,* in which this court held, that upon presentation to the Auditor of certified copies of the decrees and orders of the court in a proceeding under the over-due tax law, which orders and decrees fixed the rights of the attorneys to their fees, with the amount to be paid by the State, it was the plain ministerial duty of the Auditor to issue the certificate of indebtedness. In that case, the order allowing the fees and fixing the lien was made before the repeal of the law in 1883. In this the proceedings had begun, a large portion of the services had been rendered, and the

suits were pending when the repealing act was passed. The order allowing the fees and fixing the amount was made afterwards. The question presented is simple and clear cut, and is this: Did the repealing act have such effect as to annul or modify the rights of attorneys and officers of the court in pending proceedings?

From the petition in the court below, it seems that the provisions of the act of March 12, 1881, had been substantially pursued. By the first section of the act it was provided that any *citizen*, giving security for cost, might file a complaint in equity, showing lands in the county upon which taxes were due, or lands which had not been assessed, and praying that a lien might be fixed on the same for taxes, and that they be sold for non-payment. A separate clause of the same section provided that the county court of any county might direct such a complaint to be filed in the name of the county, to be prosecuted by the attorney for the county or some attorney retained for the purpose.

Modes of procedure were prescribed, and provisions were made for ascertaining and assessing lands subject to the act, and for the admission of any parties desiring to defend, and for condemnation for sale. In the final decree it was required that the lien upon the lands should be fixed "for all taxes, penalties and costs due on the lands proceeded against, and *with the costs shall be taxed an attorney's fee for the plaintiff*, not to exceed ten dollars for each lot or forty acres of land."

The lands were to be sold to the bidder who for the least quantity would pay the taxes, penalty and costs due on each tract. If there should be no bidders they were to be struck off to the State. In such case the State was not required by the act to pay the amount decreed against each tract, *but the costs of the proceeding*, so far as

they related to the particular lands, were to be paid by the State; and it was directed that the court should *cause the amount of such costs to be certified to the Auditor*, that he might issue his warrant on the treasury for the amount. Other details of the act have no bearing on the question.

Whilst this act was in force the suit in which the petition below was filed was instituted by a citizen and prosecuted by the petitioners as attorneys. Pending the suit, on the seventeenth of February, 1883, the act, with a supplemental act passed March 22, 1881, was wholly repealed. On the tenth of April following, the Legislature passed an act for the adjustment of claims against the State for services rendered under the provisions of the two acts of 1881. It directed that the clerks of the counties in which suits had been brought, under the act of 1881, should certify to the Auditor a list of the lands sold to the State, the names of the attorneys, clerks, printers and commissioners entitled to compensation. The claims of all these were to be audited by the Auditor, who was required to grant certificates for amounts due, as *thereinafter provided*. These certificates were made receivable in payment of State taxes and State lands, in the same manner as Auditor's warrants and State scrip. The third section, proceeding to fix the fees for these past services, provided, that where suits were brought *by order of the county court*, the attorney's fees shall be twenty-five cents for each tract as it was described on the tax-book at the time of the forfeiture. No provision was made for attorney's fees in any other case.

The case in judgment here is a proper one for a mandamus if the rights of the petitioners, acquired under the acts of 1881, have not been impaired by the acts of 1883, which were all passed pending the suit.

1. STATUTES: Repeal of.

The act of April 10, 1883, has no application. The former acts of 1881 had been repealed in February. Under the act of April 10, the Auditor of the State was only authorized to certify such claims as were provided for by the third section thereof, and these claims are expressly confined to services rendered in suits *brought by order of the county courts.* Such suits had been authorized by a distinct clause of the act of 1881, which had, generally, authorized the suits to be brought, by any citizen, in the name of the State. Whatever we may suppose to have been the intention and policy of the Legislature in its reticence in the last act, concerning suits brought by citizens, of their own motion as relators, in the name of the State, it is plain that the first act constituted them a distinct class, which must have been patent to the next Legislature. There is no room to suspect verbal misprisions, nor grounds to believe that the Legislature meant to use words in any other than their ordinary sense. If they meant to include all suits in attempting to confer upon the Auditor the power to adjust fees, they did not say so nor afford on the face of the act any indication of such intention. By no legitimate rules of construction can the third section of this act April of 10, 1883, be made to include suits of the class now in question. As to them, the duties of the Auditor remain the same as left by the act of February 17.

It is not clear that the act of April, 1883, *meant* to take away any existing rights. There is nothing either in the repealing act or in the act of April, which declares that contracts for compensation, under authority of the acts of 1881, where services were being rendered in pending suits, should be annulled or repudiated. Even with regard to suits which had been brought by order of the county court, the Auditor was only allowed to issue certificates to those who were entitled to dues, who might be willing to

execute to the Auditor a receipt in full of all demands against the State for all services rendered or charged in relation to such services as had been then, or might thereafter be rendered under the operation of such suits. It was a compromise law recognizing existing and meritorious claims, and an option to retain them. We can not suppose that the State intended arbitrarily to compel her citizens who had rendered services under her authority, with a well grounded expectation of being paid according to law, to take whatever she might afterwards offer, on her own terms, or be forever barred.

The question narrows to this: Does the sweeping repealing act of February, 1883, affect the compensation of those who had brought suits as attorneys under the first acts, which suits were pending at the time of the repeal?

There can be no reliable apportionment of an attorney's 2. Attorney's fees not apportionable. services so as to estimate their value up to the time of the repeal. An attorney's services cannot be apportioned by *time*. It is well known that the most arduous and responsible services are often rendered before the suit is brought, after which the steps in the case may be mostly formal. Frequently the preparation of a complaint with its exhibits, the collection, estimation and array of evidence in the mind of the attorney, the anticipation of defenses, and the means of meeting them, all determine the result of a suit before a summons is issued, to say nothing of the careful examinations of authorities before the responsibilities are assumed. The petitioners are entitled to all their fees under the statute of 1881, or to nothing.

We have an old statute of 1837, which has passed unchallenged through the portals of all subsequent constitutions. It provides that "no action, plea, prosecution or proceeding, civil or criminal, pending at the time any statutory provision shall be repealed, shall be affected by

such repeal; but the same shall proceed in all respects as if such statutory provision had not been repealed." There is an exception not pertinent to this case. *Rev. Stat., ch. 129, sec. 31; Gantt's Digest, sec. 5694.*

**3. LEGIS-LATURE:**

**Power over courts and future Legislatures.** This statute has very little importance save in hermeneutics, and has been rarely invoked, for no Legislature has power to prescribe to the courts rules of interpretation, or to fix for future Legislatures any limits of power as to the effect of their action. Any subsequent Legislature might make its repealing action operate in pending suits, as effectually as if no such statute existed, and the courts are quite free yet to consider what the subsequent Legislature did in fact intend, or had power to do. Still it has kept its place on the statute books, and it is persuasive at least, that subsequent Legislatures meant to keep in harmony with it, and in their legislation supposed it would go without saying, that when a repeal was made, all rights in suits pending under the old statutes would be preserved.

Upon general principles it must be premised that the original act of 1881 gave to the attorneys an interest in each suit, a lien upon each tract of land condemned for an amount to be fixed by the court, and made it the duty of the court to fix the amount. Although not a formal party (as there were no formal parties, save the relator and the State, the proceedings being *in rem*), he acquired an interest in the subject matter. He was virtually as much a party *pro interesse suo* as any one would be who might be allowed to come in and claim the land. His right to compensation did not arise from any contract with reference to fees with the relator, but from an assurance given by the State, which was in the nature of a contract, that for his services in securing its revenue, the State would impose for him, upon each tract condemned, a lien for such

services, according to a rate to be fixed by the court; and would herself pay the fee for all tracts bought in by her. The act was an experimental one to glean lost revenues, and the proceedings were in the interests of the government. Even the relators could not be presumed to have any other interest than that of promoting the interest of the government, or at most lightening their own taxes by the augmentation of supplies from other legitimate sources.

At common law the repeal of a statute ended all pending suits, civil or criminal, prosecuted under it. It left all things, save as to rights acquired by suits prosecuted and ended, as if no such act had ever been in existence. Such is still the general rule as to criminal prosecutions, in which no judgment can be pronounced not authorized by some law in existence when the judgment may be rendered. But in civil actions the courts were soon impressed with the harsh and unjust nature of the rule, in its operation upon those who had formed their plans and regulated their business under faith in the statutes, and divers exceptions to the rule were made by the English courts. See *Sedgwick on Construction*, etc., *p. 113.*

One of the exceptions was, that where a right, in the nature of a contract, had arisen under the statute, the courts would not disturb it. It was held, for instance, in the case of *Gillmore v. Executors of Shorter*, in the time of Charles II (*sec. 2, Mod., 310*), that where one had a right of action it could not be taken away by the retroactive effect of the statute of frauds prohibiting such action except upon a written agreement. The statute of frauds was in effect a repeal of so much of the former law as allowed such actions on parol agreements.

So in *Couch qui tam v. Jeffries*, which was an action for non-payment of stamp duties; an act of Parliament passed pending the suit, but before judgment, gave further time

for payment.   The defendant sought to avail himself of this, and then after verdict against him, moved to arrest judgment.   The rule to show cause was discharged and the judgment entered.   Lord Mansfield remarked: "Here is a *right vested*," meaning in the prosecutor of the *qui tam* action, "and it is not to be imagined that the Legislature could, by general words, mean to take it away from the person in whom it was so legally vested, and who had been at a great deal of cost and charge in prosecuting. They certainly meant future actions."

Construction of the repealing statute.

The remarks justly apply to the case in judgment here. Here was a right vested in the petitioning attorneys. The Legislature could not have meant by the general words of the repealing act to take it away.   They certainly meant that no future actions should be begun under the act of 1881.   The language of the English act was very strong in the last case.   It provided that on payment of the duties "that the persons who have incurred any penalties by the omissions aforesaid shall be acquitted and discharged of and from the said penalties."   Yet the court refused to believe it to have been the intention of Parliament to take away this vested right of the *qui tam* prosecutor, which originated solely from the commencement of the suit in the interest of the revenue, and punish with costs one who had been at a great deal of cost and charge in prosecuting.   The principle there announced is precisely that here involved.   *See 4 Burrows, 2460.*

The principle in America derives additional force from the Federal Constitution, which protects the obligation of contracts.   In the case of *Fletcher v. Peck, 6 Cranch, p. 135,* Chief Justice Marshall laid it down that the Legislatures were amenable to the same obligations of justice and equity which apply to individuals in society.   "When, then," he says, "a law is in its nature a contract, when absolute

rights have vested under that contract, a repeal of the law can not divest those rights, and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community."

Would it be tolerated in an individual to induce one to enter upon a business for the benefit of the employer, with an assurance of a compensation, and then finding the business unprofitable, to repudiate it whilst the services were being performed, annul the whole engagement, and deprive the employe of all compensation for his thought, time and labor already expended. We cannot attribute to the State of Arkansas such an intention. The overdue tax was an experiment, not productive of beneficial results, and was abandoned; but we cannot think that the State of Arkansas would be willing to throw the burden of the experiment upon citizens who in her behalf had labored to carry out her policy, and make it a success; nor do we think the Legislature so intended.

We conclude then that the repealing act of February, 1883, deprived the petitioners of no rights in the pending suit, and that they are entitled to compensation under the act of 1881. That the court having exercised its judicial function in fixing the amount of fees for each tract or lot, and making them a lien upon the lands, had left only the ministerial duty of causing the same to be certified by the clerk, if upon request the clerk should refuse.

We have already recognized the clerk's official certificate to a transcript of the orders and decrees, showing the amount of fees, and that they should be paid, as a sufficient compliance with the law by the clerk, to authorize the Auditor to issue the certificate of indebtedness.

Affirm the judgment.