MILTON G. ROBINSON AND WILLIAM C. DAVISS *v.*
LUCILLE K. CHAMPION

5-5627                                      475 S.W. 2d 677

Opinion delivered January 24, 1972
[Rehearing denied February 28, 1972.]

*Robinson & Daviss,* pro se.

*Theodore L. Lamb,* for appellee.

JOHN A. FOGLEMAN, Justice. This appeal involves a
decree rendered in a suit by appellee to recover alleged
excessive attorneys' fees paid appellants as her attorneys

in a divorce case. The court rendered judgment against each of the appellants in the sum of $7,250. The present action was filed nearly three years after the termination of the employment. She alleged that appellant Daviss had been paid $5,700 by her husband pursuant to court order, $7,250 by a receiver appointed in the divorce case pursuant to court order and $15,575 she paid him. She alleged that appellant Robinson had been paid the same amounts except that the amount paid by her former husband under court order was only $5,600. She contended that the fees exacted from her were excessive and that she had paid them because of undue influence of the appellants and their overreaching and imposition on the attorney-client relationship. The conduct upon which she relied was the alleged representation by the attorneys to her that she was required to make these payments in order to receive property distributions of $40,000 in March 1966 and $80,000 in October 1966. She paid appellants $5,000 each in March 1966 and $10,000 each in October 1966.

Appellants not only resisted appellee's claim but filed a counterclaim in which they alleged that they were entitled to additional fees of $12,500. There is no issue presently involved as to the amounts of compensation charged against the defendant in the divorce case, Dr. Walton T. Champion.

Among the pertinent considerations in determining the reasonableness of attorney's fees not specifically fixed by contract, as is the case here, are: the attorney's judgment, learning, ability, skill, experience, professional standing and advice, *Bockman* v. *Rorex*, 212 Ark. 948, 208 S. W. 2d 991; *St. Louis-San Francisco Ry. Co.* v. *Hurst*, 198 Ark. 546, 129 S. W. 2d 970, 122 A. L. R. 965; *Rachels* v. *Garrett*, 153 Ark. 343, 240 S. W. 1071: *Turner* v. *Turner*, 219 Ark. 259, 243 S. W. 2d 22; the relationship between the parties, *Rachels* v. *Garrett*, supra; the amount or importance of the subject matter of the case, *Rachels* v. *Garrett*, supra; *St. Louis-San Francisco Ry. Co.* v. *Hurst*, supra; *Turner* v. *Turner*, supra; the nature, extent and difficulty of services in research, collection, estimation and mental array of evi-

dence and anticipation of defenses and means of meeting them, and considering the case, receiving confidential information and giving confidential advice before any pleadings are filed or other visible step is taken, *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; *Bockman* v. *Rorex,* supra; *Files* v. *Fuller,* 44 Ark. 273; the preparation of pleadings, *Files* v. *Fuller,* supra; the proceedings actually taken and the nature and extent of the litigation, *Rachels* v. *Garrett,* supra; *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; the time and labor devoted to the client's cause, *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; *Rachels* v. *Garrett,* supra; *Turner* v. *Turner,* supra; the difficulties presented in the course of the litigation, *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; the results obtained, *Turner* v. *Turner,* supra; *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; *Bradshaw* v. *Bank of Little Rock,* 76 Ark. 501, 89 S. W. 316; and many other factors beside the time visibly employed, *St. Louis-San Francisco Ry. Co.* v. *Hurst,* supra; *Bockman* v. *Rorex,* supra. In making these determinations, both the trial court's and this court's own experience and knowledge of the character of such services may be used as a guide. *Rachels* v. *Garrett,* supra; *Aetna Life Ins. Co.* v. *Heiden,* 184 Ark. 291, 42 S. W. 2d 392; *Whetstone.* v. *Travis,* 223 Ark. 856, 269 S. W. 2d 320. Considerable weight is to be given to the opinion of the judge before whom the proceedings are conducted. *Marlin* v. *Marsh & Marsh,* 189 Ark. 1157, 76 S. W. 2d 965; *Whetstone* v. *Travis,* supra. When we give due consideration to the extensive record before us and to the factors to be considered we find that the fees allowed and paid to appellants were adequate for the services they performed, but that they were not excessive or unreasonable and that appellee is not entitled to recover any of the fees paid to them. Consequently the decree of the chancellor is reversed.

The voluminous record in the divorce case and in the incidental receivership was made a part of the record in this proceeding and was considered by the chancellor who heard this case on assignment, who was not the same chancellor who had heard all of the proceedings in the divorce case and the receivership.

The parties to the divorce case were both medical doctors practicing in Stuttgart. They were first separated sometime in 1958 when a divorce suit was filed by appellee in which she was represented by appellant Robinson A reconciliation was effected, and they lived together until June 1, 1961. Appellee first employed appellant Daviss in February or March, 1962. He arranged a temporary agreement about child custody and visitation and testified that he spent considerable time in trying to effect a reconciliation, in accordance with his client's wishes. Daviss testified that he spent many hours and held many conferences before he terminated his attempts on May 9, 1962, and filed a suit for divorce.

Daviss said that, after attorney Virgil Moncrief filed an answer for Dr. Walton Champion, he spent many hours conferring with this attorney before determining that the suit would have to be tried. At this point Dr. Walton Champion employed Mr. George E. Pike who represented him throughout the further proceedings in the case. Appellee said that she was then afraid that she was going to lose the case, so she employed the appellant Robinson in August 1962 with the approval of Daviss.

According to Chancellor Dawson before whom the case was tried, the trial consumed 10 days, which were not consecutive but ranged from September 12 to November 1. At the time of the filing of the divorce suit, appellee alleged that her husband had contributed nothing to her support or that of their four young children since the separation except for payment of utility bills and maturing installments on the mortgage on the family residence which she and the children were occupying. The first step in the proceedings was a hearing which resulted in appellee being awarded custody of the minor children, possession of the family residence, $300 per month for support of herself and the children and $100 attorneys' fees, all pendente lite.

After the trial, the chancery court found that appellee was entitled to a divorce, although she was not without fault, reaffirmed the award of child custody and

possession of the residence along with the household furnishings and equipment, allowed an additional $1,200 to apply on her attorneys' fees, awarded $350 per month for child support, out of which she was to pay the maturing family residence mortgage installments, awarded her one-third of Dr. Champion's personal property, one-third of his real estate for life, dissolved an estate by the entirety in rental residential property owned by the parties, required the husband to account for all property disposed of by him since the beginning of the action, enjoined him from disposing of or encumbering any property and appointed a commissioner to sell all of the defendant's real and personal property if the parties had not reached an acceptable agreement on the property distribution within 90 days of September 1, 1963. All costs were assessed against the husband. The entry of a formal decree was withheld until April of 1963, apparently with the approval of the court, while unsuccessful negotiations to arrive at a settlement on the distribution of property were being conducted by appellants and attorney Pike.

There can be no doubt that the divorce proceeding was acrimoniously contested and many charges and countercharges of infidelity and indiscreet conduct were aired, along with other bitter complaints. The parties also seemed to have constantly bickered over the children's visitation with their father, his tardiness in returning them to the mother's custody and their resulting absence from school. The husband unsuccessfully appealed to this court. See *Champion* v. *Champion,* 238 Ark. 87, 378 S. W. 2d 648, decided May 11, 1964. Although the appeal seemed to be general, when the appellant's brief was filed here, he only asserted error in that part of the decree ordering a sale of the property. Meanwhile, he had applied to the chancery court for relief, asserting that he could not pay child support until the property division was accomplished, and that he could not conduct farming operations on the lands owned by him unless the appellee signed a $70,000 mortgage. When the court would not compel her to do so, the parties filed a joint petition asking for the appointment of a receiver for the defendant's property al-

leging that there was danger of losing about 3,000 acres of farmland by foreclosure of a $130,000 mortgage.

The court appointed John Gunnell, the clerk of the court, as receiver, finding that the equities of both the parties and their children in approximately 4,000 acres of land in Lee, Arkansas, Monroe and Prairie Counties, the homestead and residential rental property in Stuttgart were in imminent danger unless the farm operation loan could be secured.

Subsequently, but still during the pendency of his appeal, Dr. Walton Champion applied to the chancery court for a modification of its decree, alleging that his request for the appointment of a receiver was necessitated by appellee's failure to sign mortgages for loans to him to produce crops in 1963 and that he was unable to make a property division because of the large amount of indebtedness against the property. This petition was denied when heard. There was a reduction in the indebtedness in 1963, and the receivership was continued in 1964 and 1965 upon joint petition of the parties. During the course of the receivership it developed that Dr. Walton Champion had entered into leases with his tenants after the court's decision in the divorce case was rendered but before the decree was actually entered and the receiver appointed. The term of these leases extended to December 31, 1966. When contention arose with reference to the propriety of these leases, the tenants intervened, but the matter was finally settled by stipulation that the contracts be terminated on December 31, 1965, and the tenants were given 30 days within which to submit offers for the purchase of the Lee County lands, and the leases were ultimately canceled by the court.

Appellee had some assets and had some income from the practice of medicine over the years, and will have income in the future. She was earning about $20,-000 per year at the time of this trial. She owned a residential rental house on which there was a mortgage debt of approximately $2,800 payable in monthly installments of $47.50 and from which she had rental income of $55 per month. Although she admitted that her

husband had given her $9,000 from the proceeds of sale of a farm in 1958, she said that she only had $200 in a savings account and $100 in a checking account. Her husband claimed that she had several thousand dollars hidden at home.

During the course of the trial there was introduced on behalf of appellants a financial statement prepared by Walton Champion dated April 18, 1962, showing assets of $967,628.86, liabilities of $216,143.87 and a net worth of $751,484.99. He claimed that he had "puffed up" the values in order to try to obtain a loan to pay debts and an IRS lien, and that he was on the verge of bankruptcy and unable to pay his bills. A federal IRS lien against both parties for some $6,000 or $7,000 had been filed. In a hearing regarding attorneys' fees to be paid by the receivership, attorney Pike testified that his client had been practically insolvent at the time. The defendant said that avoidance of bankruptcy and the welfare of the children were his reasons for contesting the divorce.

During the trial the husband produced testimony about the value of two farms—the Buckhorn farm in Lee County and the Brummitt farm. He said that the operation of the Buckhorn farm had been unprofitable and that he had unsuccessfully attempted to operate the Brummitt farm as a duck hunting club. He produced witnesses as to the value of the lands. None of them placed a value on the Buckhorn farm as high as that placed by the defendant himself which was $55 per acre or $117,150. He said that the first mortgage debt on this property was $130,000 plus $8,100 interest in addition to some debt of $6,500. The highest value placed on the Brummitt farm was $100 per acre or $60,800. An appraiser placed the value of the family residence, purchased for $15,000 in May 1946, at $25,000. It was subject to a mortgage balance of $12,000. His appraiser valued five or six lots in Stuttgart at $2,000, but the defendant said he had received an offer of $2,700 for them after he put them up for sale. His appraisal witness testified that the residential rental property was worth only $9,000. The rental income from it was $32.50

per week. Dr. Walton Champion said that he had no unmortgaged property and that the Forrest City Production Credit Association mortgage covered all real estate owned by him for an indebtedness of approximately $65,000. He said that he was paying $200 per month on a mortgage on his medical equipment. It appears that appellee was personally obligated on the real estate mortgages on the farms and the family residence. The defendant said that the income from the clinic was not sufficient for him to pay current bills after the divorce case was filed. He listed unsecured debts of more than $45,000. An agreed appraisal of various corporate stocks owned by him showed a total value of $3,792.50. This was also pledged to Forrest City Production Credit Association.

After the court directed the receiver to list the real property for sale in 1965, an offer of $685,000 was received for the Lee County land with the seller to pay a real estate commission of $30,000. The court directed the receiver to accept this offer. After the sale was closed the receiver's report showed that he held a balance of $485,554.66 from the sale of the property after the payment of all debts of the estate and the real estate commission.

A petition signed and verified by appellee was filed on February 18, 1966, asking that her attorneys be allowed additional fees. On March 7, 1966, the court ordered distribution of $40,000 to each of the Champions on their joint petition. On March 15, 1966, the court ordered $10,000 paid to each of appellants by the receiver as partial fees, reserving their allocation, as well as determination of total fees, until a later date, and specifying that no provision of its order was to be construed as any determination or limitation of attorneys' fees to be paid by appellee in addition to this allowance.

A further distribution of $130,000 to Dr. Walton Champion and $80,000 to Dr. Lucille Champion was ordered in October 1966, and the court directed that the disbursements to appellee be made payable to her and her attorneys. About this time, Mr. George E. Pike

filed a petition for attorneys' fees for services to the receivership, reciting 470 hours of work in 59 items and 18 court appearances and numerous conferences pertaining to the receivership and land sale. Dr. Walton Champion approved the payment of additional fees to his own attorney, but resisted allowance of additional fees to appellants, alleging that fees of approximately $25,000 previously paid to them were in excess of the value of their services. He was represented at this hearing, not only by his regularly employed attorney, but by John Dale Thweatt and James M. Thweatt. Appellee filed a verified response in which she alleged that it was understood by all parties that attorneys for both plaintiff and defendant would keep abreast of receivership activities and that both parties had received considerable benefit from the resulting procedures which had entailed considerable work by all the attorneys, in excess of what would have been otherwise required. She asked that her attorneys be awarded a proper fee and agreed that a part be allocated to the receivership.

In his opinion, at the time the divorce was granted, the chancellor had recited that the trial was the longest divorce trial he had ever had, that it was rather involved, that the evidence indicated such a bad financial condition that the defendant was unable to pay child support in accordance with the needs of the children, and that much time and effort had been expended by appellee's attorneys prior to the beginning of the trial. He stated that the amount of attorneys' fees allowed was not representative of the true and correct value of their services to appellee and that it was set upon consideration of the defendant's financial condition.

The chancellor who had heard all previous proceedings conducted a three-day hearing on the matter of attorneys' fees in the receivership, after which he allocated his previous allowances to charge one-half of the payment made by the receiver to each of the appellants to the receivership and the other one-half to Dr. Walton Champion, and allowed a fee of $12,000 to Pike to be charged as receivership expenses, in addition to $2,000 previously paid him. When appellee expressed dissat-

isfaction with the services of appellants during this hearing, the court permitted them to withdraw as her attorneys. In August 1967 the Champions asked approval of a settlement between them by joint petition. This settlement gave her fee title to two lots in Stuttgart, a plot of land 150 feet by 250 feet, the family residence, one-third of the Empire Life Insurance Company stock, all sums previously distributed to her and all personalty in her possession. Walton Champion received all assets in the hands of the receiver and all other property. The agreement contained this recitation:

> The charges made against each party directly or through the receivership by order of the Court respecting attorney fees, receivership fees and Court costs are ratified and confirmed by the parties so far as the same concern each of them.

He waived any interest in any amount appellee might recover from her attorneys for fees paid by her from her own funds. The joint petition also recited that:

> * * * since the rendition of the divorce decree there have been almost innumerable hearings before the Court with respect to the handling of the defendant's property and with respect to disputes and controversies between the parties concerning their individual interests in said property, the operation of the farm lands constituting a part of said property, the proper allocation of income and expenses in connection with the farm operations, and the propriety of certain attorneys' fees, receivership fees, and as to which of the parties should be charged with same.

> * * * there has been a dispute between the parties with regard to the distribution of the proceeds from the sale of the lands in Lee County and with respect to other funds and assets in the hands of the Receiver.

> * * * there has been disagreement between the parties as to which party should be charged with cer-

tain disbursements made by the receiver and there has been general disagreement between the parties as to the distribution of charges between them for almost each and every disbursement made by the receiver since the inception of the receivership; that all such controversy between the parties has consisted of disputes not only with regard to the law and to the facts but also as to accounting.

At the commencement of this hearing, the chancellor commented that he had allowed a very "negligible" fee to appellee's attorneys considering the time spent, because of the impression that Walton Champion was insolvent. Later he commented that the allowance was "measly." He emphasized that he would not go into the matter of fees paid by appellee over and above the court awards. The chancellor who heard this suit on assignment found that there was a conflict of interest arising from the representation of the receiver by the attorneys representing the parties even though done with full knowledge of the court. For this reason he held that it was only fair that Mrs. Champion receive the benefit of the fees that were allowed to her attorneys in the receivership, amounting to $7,250. He said he considered himself bound by the court's previous finding that these fees were reasonable. He found that a reasonable fee for the attorneys was $21,275 for appellant Daviss and $21,-175 for appellant Robinson, which he arrived at by allowing $20 per hour for 751¼ hours, $3,750 for the trial work and $2,500 each for the appeal to the supreme court. The difference between the two allowances was attributed to a $100 allowance to Daviss for a hearing before Robinson was employed. Judgment was rendered against appellants for the exact amount of the fees previously allowed them for services to the receivership, as confirmed by the chancellor at the conclusion of his findings.

There can be no doubt that the representation of the receivership by the attorneys representing the parties in the divorce case was done with the full approval of the chancellor who heard the divorce case and appointed the receiver. While it would certainly be the better practice

in most cases for a receiver to have independent counsel, there are cases, such as this, in which the intimate knowledge of the attorneys representing the parties in the case can be of benefit to all concerned. Representation of the receiver by appellee's attorneys did not in any way jeopardize her interests but probably was to her benefit. We have previously recognized that there are situations in which a practicing attorney may properly appear for more than a single client without being placed in the position of divided loyalty or exposed to the temptation to conciliate rather than vigorously espouse the rights of the clients he represents. We have recognized that this is the case in matters such as probate proceedings, corporate reorganizations, bills of interpleader, and litigation characterized as a free-for-all receivership. *American-Canadian Oil & Drilling Corp.* v. *Aldridge & Stroud, Inc.,* 237 Ark. 407, 373 S. W. 2d 148.

Unfortunately, as pointed out by the chancellor, no records were kept by appellants in relation to their services, and their testimony in that regard had to be based upon recollection and estimates. Still, it seems to us that they justified the amount of fees paid to them. Appellee was relieved of personal liability on debts well in excess of $200,000. She received cash distributions of $120,000 and real estate valued at more than $25,000. It seems likely that, had she not entered into the settlement after withdrawal of the appellants, she would have received other property and funds which were then cleared of all indebtedness. When consideration is given to the fact that she was not found blameless and that her husband was considered to be insolvent at the time of the divorce, it seems that the results to her were as advantageous as anyone could possibly have dreamed. A forced sale of the property would have left little for either party. Avoidance of foreclosure was necessary.

Daviss estimated his pretrial work at 350 hours. During the period of the trial he estimated that he spent an additional 250 hours in preparation, conferences with witnesses, co-counsel and client and in research. Between the end of the trial and the entry of the decree, Daviss estimated that both he and Robinson spent 500

hours conferring with adversary counsel and their client and investigating the property, its value and susceptibility to division. Pike testified that there were numerous conferences among the attorneys and remarked that there were sometimes rather heated discussions. Daviss estimated that his time spent between the end of the trial and the entry of the decree averaged 20 hours per week. He said that he spent 50 hours working on the brief on appeal, but Robinson spent more time. It seems that Robinson and Daviss agreed that this would be a means of equalizing of time spent by the two attorneys after Daviss was first employed. Daviss estimated the time spent after the entry of the decree at 2,100 hours of which he allotted 540 to the receivership.

Robinson testified that while the trial was in progress he spent at least half of his time on this case, and estimated that this amounted to a total of 250 hours. He said that he spent 100 hours on the appellate brief and estimated that after May 1, 1963, he had spent an average of 12 hours per week except for a four-week vacation period, or a total of 2,280 hours. Robinson stated that he spent almost his full time on the case from the time he was employed until the trial started. Since he had been employed after the case had been pending for some time, he thought that it was necessary that he review the case with Daviss and the client thoroughly and that he review his file in the previous case, interview witnesses and do research. He said that a conservative estimate of this time was 300 hours. He fixed his total time devoted to the matter, including services to the receiver, at 3,380 hours. He noted that the defendant had subpoenaed close to 100 witnesses, and said that he spent considerable time investigating to determine what their testimony would be. Some of these witnesses did not live in the community. He also said that he spent considerable time interviewing witnesses that his client brought to the office, most of whom either could not or would not be helpful in the case.

In considering the results we should not overlook the fact that child support of $350 per month had been

paid in full at the time of the trial. This might not be significant except for the fact that all of the parties were convinced that Dr. Champion was unable to make the payments at the time of the divorce decree, and many delinquencies were enforced only when the appellants took steps to see that they were paid from funds in the hands of the receiver and charged to the defendant. Furthermore, it should be noted that, after the cash distributions were made, Walton Champion still owned the Brummitt farm, then appraised at $200 per acre, and 120 acres of land in Monroe County, both unencumbered. The last report of the receiver before the settlement made by the parties showed that he had on hand $131,969.24. Appellant Daviss testified that the settlement between the parties did not give appellee nearly what she was entitled to. While the propriety of the settlement is not in issue, it does seem that, after appellants withdrew, the settlement arrived at was certainly not more beneficial to appellee than it was to Walton Champion. Although there was no contract for any specific amount of compensation, and no one urges that compensation should be awarded on a contingency basis, certainly the availability of the remaining property for division is a matter to be considered in weighing the results obtained through the efforts of appellants.

It could well be that this litigation stemmed from a misunderstanding on the part of appellee, for which appellants may be partly to blame. In answers to interrogatories she stated that she felt that the results obtained by the attorneys should not have any bearing on their compensation. She also stated that she had received a considerable amount through the litigation, but felt that the attorneys were seeking compensation on a contingency basis, to which she objected. She had no idea how she came to be relieved of personal obligations on the mortgage debts. She could not remember signing many of the verified pleadings filed in her behalf. She made no protest about the payment of $5,000 each in March of 1966, probably because of the statements of the chancellor when the distribution was ordered. She did say that she thought the fees were high. While she said she told the attorneys that she thought they were

awfully expensive when she paid them $10,000 each after the $80,000 distribution, she said she did not consider any other action and recalled that the chancellor had said that additional fees were not in the jurisdiction of the court. She attempted to minimize the time devoted to the case by the lawyers, but she offered no real contradiction to their testimony except to say that she only saw them a total of 15 or 16 times, that they only put three or four witnesses on the stand in the trial of the case and that a hearing on her petition to remove the children to California for which she paid a fee of $500 took only about four hours. She said that at one time she voluntarily paid $100, and at another $50, to her attorneys because they were working "so hard."

Insofar as the services of the attorneys to the receivers are concerned, the one person in the best position to evaluate this compensation was the chancellor before whom the entire proceedings were conducted. We give considerable weight to his findings in that regard, and find the evidence amply supports the allowance. In this regard, it is notable that no one objects to the payments made to Pike.[1]

Appellants made court appearances and performed services for the receiver over and above those performed by Pike. For instance, they successfully contested a claim of Stuttgart Machine Works for more than $4,000 for improvements contracted for by Pike's client. They also performed services in connection with the collection of money by Walton Champion that should have gone into the receivership and with the claims of his lessees. They regularly reviewed the bills submitted to the receiver by Walton Champion through Pike, along with other bills, and Pike agreed with them that there was a great deal of contention about these bills. All these attorneys agreed that two days' preparation was required for each court appearance. Pike said that these

---

[1]In considering the overall compensation, it should be noted that Pike accepted employment for a fixed fee of $3,000 and that the Thweatts were paid a retainer of $5,000 upon their late entry into the case.

832

appearances required from one hour to several hours. In addition, appellants spent a full day in closing the land sale by the receiver. The fee allowances for appellants' services to the receiver were proper and reasonable, and we see no reason for appellee to have credit for them.

Even though it would have been much more satisfactory if some records had been made from time to time as to the services rendered by appellants, we feel that a preponderance of the evidence indicates that the fees paid them were not unreasonable or excessive and that the judgment against them should be reversed. On the other hand, we cannot say that appellants have shown by a preponderance of the evidence that they are entitled to additional compensation, and the decree, insofar as this feature of the case is concerned, is affirmed.

GEORGE ROSE SMITH, J., dissents.